# EXHIBIT A



IN THE MATTER OF:

Hughes Socol Piers Resnick & Dym Ltd.,
Cohen Law Group,

        Claimants,

vs.

Kenneth Elder, Elizabeth Elder, G3
Analytics, LLC,

        Respondents.

CASE NO. 1340013857

## ARBITRATION DECISION AND FINAL AWARD

Counsel for Claimants:
Matthew J. Piers, Esq.
Joshua Karsh, Esq.
Juliet Berger-White, Esq.
Hughes Socol Piers Resnick & Dym Ltd.
70 W. Madison St., Suite 4000, Chicago, IL 60602

Steven H. Cohen, Esq.
Cohen Law Group
70 W. Madison St., Suite 4000, Chicago, IL 60602

Counsel for Respondents:
Amir R. Tahmassebi
Konicek & Dillon PC
21 W. State St., Geneva, IL 60134

Arbitrator:
Hon. Susan Zwick (Ret.)
JAMS
71 South Wacker Drive, Suite 3090, Chicago, Illinois 60606

Place of Arbitration: Chicago, Illinois

Date of Award: December 21, 2017

## I. PROCEDURAL STATEMENT:

The claimants, Cohen Law Group and Hughes Socol Piers Resnick & Dym, Ltd. and the respondents, Kenneth Elder, Elizabeth Elder and G3 Analytics, LLC entered into an Engagement and Fee Agreement, dated March 3, 2014. The purpose of the agreement was to undertake and prosecute certain *qui tam* actions as defined.

On August 13, 2014 Kenneth Elder and G3 Analytics withdrew from the agreement and claimant sought to recover their attorneys fees. When the issues remained in conflict, claimants demanded the parties submit to mediation under the alternative dispute resolution provisions of the March 2014 contract.

Respondents filed a declaratory suit in circuit court, seeking a determination that the agreement was unenforceable. The circuit court dismissed the suit, returning the issues to arbitration. This order was subsequently affirmed by the appellate court.

The matter was unsuccessfully mediated, and then submitted to arbitration. The arbitrator entered eight discovery orders establishing the procedures for arbitration. The parties engaged in discovery; discovery disputes were resolved by written orders on March 1, March 9, March 15, and August 17, 2017.

This matter proceeded to Arbitration on September 19, 2017 and September 20, 2017. The following witnesses testified in the proceedings:

| For the Claimant | For the Respondent |
|---|---|
| Steven Cohen, Esq. | Kenneth Elder |
| Juliette Berger-White, Esq. | [G3 Analytics, LLC] |
| Joshua Karsh, Esq. | |
| Mathew Piers, Esq. | |

All evidentiary matters were concluded on the aforestated dates. In accord with the arbitration orders of September 21, 2017, and November 22, 2017, both parties have submitted written closing statements.

The factual findings, delineated herein, are derived from admissions in the pleadings, testimony and evidentiary exhibits presented at hearing. To the extent that these findings differ from any party's position, that is the result of a determination by the arbitrator as to the credibility, relevance, burden of proof considerations, legal principles and an evaluation of the oral and written evidence presented.

After hearing the evidence presented, the arguments of counsel, and review of the pleadings, memorandum and case law, it is stated as follows:

## II. UNDERLYING FACTS AND TESTIMONY:

The claimants, Cohen Law Group [Cohen] and Hughes Socol Piers Resnick & Dym, Ltd. [Hughes, Socol] are individual law firms engaged in the practice of law and specializing in the prosecution of *qui tam* litigation. The firms have a cooperative arrangement to jointly handle false claims and *qui tam* cases, doing business as Whistleblower Advocates. This business arraignment preceded the factual circumstances that give rise to this claim. At all times, Steven Cohen is, and remains Of Counsel with Hughes, Socol.

In December 2013, the respondent, Kenneth Elder and claimant, Steven Cohen, engaged in discussions concerning the prosecution of *qui tam* statutes regarding the failure to surrender unclaimed property as required by certain states ["Unclaimed Property Litigation"]. In early January 2014, Mr. Elder, Mr. Cohen and Ms. Berger-White [of Hughes Socol] began discussions for Whistleblower Advocates to provide representation to Kenneth Elder and G3Analytics [G3] a limited liability company owned by Mr. Elder. The purpose of the representation was to pursue a *qui tam* action [predicated on the unclaimed property theory] in Illinois, and eventually, nationwide, with Mr. Elder as the relator.

In the initial discussions, it was learned that Mr. Elder and G3 Analytics had a consulting agreement with Total Assets Recovery Systems ["TARS"], (identified in the consulting agreement as "Company") an organization of attorneys that were relators in *qui tam* actions regarding unremitted life insurance proceeds. A major concern to all parties was the effect of the TARS consulting agreement on the potential litigation under discussion. The agreement, on its face, required G3 Analytics (as "Consultant") to "be available and (shall) provide to the Company (TARS) professional consulting services in the area of unremitted insurance proceeds for the purposes of various *qui tam* lawsuits (Consulting Services) as requested." Consulting Agreement, ¶ 1 [Arbitration Exhibit D].

With respect to Mr. Elder's obligation to TARS, it was determined that the pursuit of New York financial institutions and their role in the failure to surrender unclaimed property in that state was also contemplated by the TARS agreement. Any agreement between Mr. Elder, G3 Analytics and the claimants would have to exclude this area of potential overlap with TARS.

The TARS contract contained a Confidentiality Clause, which states as follows:

> "4. **Confidentiality/Exclusivity.** In the course of performing Consulting Services, the parties recognize that Consultant (G3Analytics) and the Company (TARS) may come in contact with or become familiar with information which the Company or its subsidiaries may consider confidential. This information may include, but is not limited to, information pertaining to the Company or Consultant, which information may be of value to a competitor. Consultant and the Company agree to keep all such information confidential and not to discuss or divulge it to any other than appropriate Company or Consultant personnel or their designees. Additionally, Consultant agrees not to utilize any information obtained for the company or for itself or any other party as it pertains to *qui tam* lawsuits."

TARS Consulting Agreement, August 20, 2010. [Arbitration Exhibit D]

An amendment to the agreement was executed on September 1, 2011. The amendment changed the terms of ¶2 **Consideration,** and did not alter any other provisions.

The TARS agreement and amendment was sent to Mr. Cohen of January 11, 2014, with the following:

> "Steve,
> First, I would like to make it official that I have retained you as special counsel to G3 Analytics effective as of our first call.
> Second, I've attached my agreement and addendum with TARS to this email. I have an idea on a way out of this morass. Let's talk about this offline from Monday's call."

[Arbitration Exhibit C]

In that same e-mail, Mr. Elder identified the parties to the agreement, the principals in the TARS organization (Gregory Lyman) and stated the following:

> "TARS contributed $40K in cash to purchase a supercomputer at the time of the first amendment and Greg started putting in 40 Hrs. a week on this project- per our agreement (verbal). However, all the IP is mine from concept to production and everything in between."

[Arbitration Exhibit C]

E-mails between Mr. Elder, Mr. Cohen, Ms. Berger-White and Mr. Karsh detail continued discussions of the prosecution of non-insurance [Unclaimed Property] *qui tam* actions in six states. [Arbitration Exhibit F] The contingency agreement was signed between the parties in Mach 2014.[1] [Arbitration Exhibit G]

The agreement between the parties, executed in March 2014, contains the following provision:

> "1. **Exclusive Relationship:**
> ....
> B. Non- Illinois Unclaimed Property Litigation: In addition to retaining us to represent you in the Illinois Unclaimed Property Litigation, you are also retaining our Law Firms to represent you with regard to all Unclaimed Property Litigation in other states [Non-Illinois Unclaimed Property Litigation] except for those cases covered by a representation agreement between Getnick & Getnick LLC, a Michigan Limited Liability Company and Total Assets Recovery Services LLC [TARS] relating to the failure of business entities to properly escheat unclaimed property in the state of New York, which was fully executed on [DATE] or by a Consulting Agreement, as amended, between G3 Analytics LLC and TARS, relating to unremitted life insurance proceed, which was fully executed on August 20, 2010. ...."

[Arbitration Exhibit G]

According to the testimony, the terms and scope of the retainer agreement that Cohen and Hughes Socol required in *qui tam* cases was discussed prior to signing. Mr. Cohen testified that he the explained the terms of the agreement and the arrangement between the law firms to Mr. Elder. Mr. Cohen understood Mr. Elder and G3 were professional relators; prosecution of *qui tam* actions was their principal business.

---

[1] Mr. Elder signed the Contingency Agreement on March 3, 2014. Matt Piers of the Hughes, Socol signed the agreement on March 7, 2014 and Mr. Cohen signed the agreement on March 10, 2014.

With respect to the use of both firms, Mr. Elder approved. He also acknowledged and understood the terms of the agreement.

Mr. Elder testified that he would only proceed with the Unclaimed Property litigation after he received an opinion by Mr. Cohen and the remaining attorneys, that TARS had no claim in the litigation under consideration. It was determined, based on the consulting contract with TARS, the agreement between TARS and G3 was limited to insurance proceeds, and did not overlap into the current litigation contemplated by these parties. Once that assurance was received, Mr. Elder continued to work with the claimants, eventually signed the Contingency Fee Agreement as stated above. He testified that, when he signed the agreement, he did not realize he would be responsible for the attorney's investigatory fees.

Mr. Karsh testified that prosecution of a *qui tam* case requires all research to be accurate and complete before the matter is approached. The attorneys and relator present the initial case with the goal of having it taken for continued prosecution by the Attorney General. The investigation undertaken and evidence gathering is global: the nature of the law and the basis for the breach is explored [the "novelty" of the suit]; witnesses are interviewed; corroborative evidence is gathered. Each case is unique to the state, so the research is extensive. Once accomplished, the facts must be evaluated to determine viability of suit. In this case, there was no legal precedent for the action, so they were mapping a false claim act theory for the unclaimed property. Mr. Piers and Mr. Cohen testified that, as a consensus, they did not want to litigate in an untested area of the law without the government's support.

Mr. Elder and G3 utilized their expertise to develop a matrix (Interest Assessment Program) for tracking the "unclaimed property" and interest paid on property (i.e. bank accounts) that was retained by the institution and not surrendered, as required by law. The development of the matrix, or the Interest Assessment Program, was Mr. Elder's role. Once the claim was determined viable, a disclosure statement was drafted. According to Mr. Cohen, the disclosure statement contains evidence [including witness identity and narratives]. The disclosure statement is more detailed than a complaint, and is the preferred document to present to the Attorney General.

In this instance, the decision to move toward filing was reached in May 2014. The drafting of the disclosure statement was concluded soon after this time, as established by the testimony of both Mr. Cohen and Mr. Piers. Mr. Elder was the relator; the complaint would be filed under seal.

By June 2014, Mr. Cohen was prepared to file in Illinois and Delaware, but wanted to be certain that TARS would not assert any interest in the litigation. Mr. Cohen and Mr. Karsh testified that TARS involvement would sufficiently complicate the issues so that the Attorney General would refuse the claims. All witnesses had testified that TARS involvement, in light of a perceived ethical conflict, would bankrupt the litigation.

Mr. Cohen requested that Mr. Elder speak to Greg Lyman, TARS principal, and obtain an assurance that no interest would be asserted in the imminent litigation. On July 8, 2014, Mr. Elder informed Mr. Cohen that TARS wanted to be involved in the Unclaimed Property Litigation. [Arbitration Exhibit I, J] Mr. Cohen requested a written waiver from TARS before filing the contemplated action. On July 25, 2014, claimants were informed that TARS claimed the Interest Assessment Program was within the contractual

agreement between G3 and TARS, and insisted on asserting its interest in the Unclaimed Property Litigation. [Arbitration Exhibit K]

Mr. Piers was concerned that TARS was pressuring Mr. Elder, and perceived that TARS had Mr. Elder "over a barrel." Mr. Piers testified to discussion between himself, Mr. Cohen, and Mr. Elder to try to reach a compromise with TARS so the cases could proceed, and requested that Mr. Elder arrange a phone conversation, or a face-to-face meeting. He discussed with Mr. Elder the financial obligation owed to the claimants, and advised him if he (Mr. Elder) decided to proceed without the claimants, approximately $200,000 in attorneys' fees were currently owed.

On August 13, 2014, Mr. Elder sent an e-mail to Mr. Cohen:
> "Steve
> On the advice of our general counsel please accept this as notice of G3 exercising its option to withdraw (item #9) from our engagement and fee agreement executed March 5, 2014.
>
> Ken Elder
> G3 Analytics"

[Arbitration Exhibit L]

On September 14, 2014 Mr. Piers sent the bill for legal services to Mr. Elder. [Arbitration Exhibit H] The bill totaled $233,597.26. When the invoice remained unpaid, claimants demanded mediation under the alternative dispute resolution provisions of the March 2014 contract. Respondents filed suit in circuit court, seeking a declaratory judgment invalidating the fee agreement. When the declaratory action was dismissed, respondents sought appellate review. The appellate court determined that all issues, including the issue of the validity of the fee agreement would be determined at arbitration.[2]

### III. ARBITRABILITY OF FEE AGREEMENT

Respondents contend that the Engagement and Fee Agreement violates Illinois law and the Rules of Professional Conduct, specifically RPC 1.5. This rule requires a lawyer to have a client confirm in writing, that if there is a fee sharing agreement between lawyers, the client is given full disclosure of the agreement. ***Ferris, Thompson & Zweig, LTD., v. Espisito,*** 2017 IL 121297; 2017 WL 2180593 [SCT.Ill. 5/18/2017]

---

[2] See: ***G3 Analytics and Ken Elder v. Hughes Socol Piers Resnick & Dym, Ltd***, 2016 IL App(1st) 160369; 67 N.E.3d 940 (2016) [Cert. Den. 2017 WL 1193037]

Subsection (e), the provision at issue in this case, addresses the division of fees between lawyers who are not in the same firm. [Ill. R. Prof'l Conduct (2010) R.1.5(e) (eff. Jan. 1, 2010)] The rule states as follows:

"(e) A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer, or if the primary service performed by one lawyer is the referral of the client to another lawyer and each lawyer assumes joint financial responsibility for the representation;

(2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and

(3) the total fee is reasonable."

The Rules of Professional Conduct apply to all claims for fee sharing, regardless of whether the claim is asserted against the client or another attorney. See: *Hofreiter v. Leigh*, 124 Ill.App.3d 1052, 1055, 465 N.E.2d 110, 112–13 (1984). The respondents challenge the arbitrability of the agreement on public policy grounds, contending that the Engagement and Fee Agreement failed to comply with Rule 1.5 (e) of the Illinois Rules of Professional Conduct (2010) and is therefore invalid.

The rule applies to lawyers who are not members of the same firm. Here, all claimants share a professional identity; Mr. Cohen is a member (of Counsel) of Hughes, Socol.

The agreement that Mr. Elder signed in March 2014 hired both the Cohen Law Group and Hughes, Socol. The contract specifically states:

2. **Joint Representation**: Being represented jointly by our Law Firms, and possibly by other lawyers or firms added by us, will not result in any additional cost to you. The information you provide, and your attorney's work product will be shared between our Law Firms (and any others we bring in) but remains confidential. Our Law Firms will divide fees with each other based on an agreement [entitled "Co-Counsel Agreement between Hughes, Socol, Piers, Resnick & Dym, LTD. and the Cohen Law Group, P.C.] which will govern the division of work and compensation between our Law Firms. Our Law Firms will disclose a copy of the Co-Counsel Agreement to you."

At the point of investigation, and the drafting of the Disclosure Statement, all attorneys working with Mr. Elder were members of the same firm. Although the contract contemplated outside counsel, that stage had not been reached. Respondent's position that the agreement is violative of Rule 1.5 is unfounded.

Respondent's further state that the Engagement and Fee Agreement violates Rules of Professional Conduct, specifically RPC 1.5 (a), because it allows claimants to collect an unreasonable fee, or a double recovery. The provision under scrutiny states as follows:

8. **Termination of Representation by Clients**: You may terminate our Law Firms representation of you at any time for any reason. However, if you terminate our representation after our Law Firm files a case on your behalf, then you agree to pay our Law Firms all costs and expenses we have incurred, plus the reasonable value of our services up to the date of termination. You agree that the reasonable value of our Law Firm's services shall not be less than the value of the time spent on your case billed at our hourly rates for complex litigation, as effective at the time of payment, plus no less than 33% of any amount recovered by you."

[Arbitration Exhibit A]

The Engagement and Fee Agreement contains a provision entitled "Fee Structure", which requires the law firm to advance all legal fees and costs in the Unclaimed Property Litigation. It also states:

> "Due to the complexity and expense of this type of litigation,….and the uncertainty of recovery in the Unclaimed Property Litigation, you understand and agree that our law firm is entitled to collect both a percentage of recovery fee from any recovery obtained on behalf of the Relator [as set forth in Paragraph 4 (c) below] plus statutory expenses, fees and costs from the Defendants [as set forth in Paragraph 4(d) below] It also delineates that percentage of recovery at 35% of the Relator's share, should the Government intervene, or 40% of the relator's share, should the Government decline to intervene and the firm prosecute the case solely on the relator's behalf."

It is of note that *qui tam* litigation is unique, and unlike most other state and federal statutes that allow for fee shifting, the purpose of the award to a relator is not primarily for the purpose of "making an injured party whole." The relator sues on a principal, and on behalf of the government or public. The relator's fee is governed by statute, and is "generally viewed as a finder's fee." See: ***United States ex rel. Alderson v. Quorum Health Group, Inc.***, 171 F.Supp.2d 1323, 2001 WL 1480549 (M.D.Fl.2001).

If the relator successfully prosecutes a *qui tam* action, the attorneys may be eligible to collect fees and costs from the defendant. The courts that have addressed this issue quickly distinguish between the statutory expenses required of a losing defendant, and the contingency agreement that a plaintiff may have with counsel. What a losing defendant must pay under the statute is not the same issue as what a prevailing plaintiff may owe his lawyer under a contingency fee agreement. See: ***U.S. v. Cooper Health System***, 940 F. Supp. 2d 208, 2013 WL 1707952 [citing ***Venegas v. Mitchell***, 495 U.S. 82, 110 S.Ct. 1679, 109 L.Ed 2d 74 (1990); ***Gisbrecht v. Barnhart***, 535 U.S. 789, 122 S. Ct. 1817, 152 L.Ed2d 996 (2002)]. No authority offered by either party has determined this to be a double recovery.

The inclusion of both a contingency fee and hourly compensation in ¶ 8 is reflective of the common damage awards allowed to prevailing relators. Illinois has not addressed the issue of whether the recovery of both statutory fees and a contingency fee *per se* unreasonable, but the courts that have addressed the issue have determined it is not.[3] While it is true that the enforceability of the contract is subject to the "reasonableness" provision of Rule 15(a), the standard that "a lawyer's fee shall be reasonable" is determined at the time of payment, not prospectively. See: ***Venegas v. Mitchell***, 495 U.S. at 88.; ***U.S. v. Cooper Health System***, 940 F. Supp. 2d at 212. Here, ¶8 is not subject to scrutiny, as it was not relied upon by either party in the action. It can not be argued that the fees sought by counsel were unreasonable *per se*, as the claimants seek no damages under ¶8.

Respondents also rely upon a perceived violation of Ill. R.P.C. 1.8 to render the Engagement and Fee Agreement unenforceable. Generally, it is argued that allowing a contingency agreement on the issue of compensation to survive after the attorney has been terminated creates a conflict of interest violative

---

[3] 6Th Cir:[ ***United States ex rel. Lefan v. General Electric Co.***, 394 Fed.Appx. 265, 272; 2010 WL 3476666 (6th Cir.2010)] ; Florida:[***United States ex rel. Alderson v. Quorum Health Group, Inc.***, 171 F.Supp.2d 1323, 1335 n. 35, 2001 WL 1480549 (M.D.Fla.2001)] Vermont: [ ***United States ex rel. Poulton v. Anesthesia Associates of Burlington, Inc.***, 87 F.Supp.2d 351, 359 (D.Vt.2000)]; Pennsylvania: [ ***United States ex rel. John Doe I v. Pennsylvania Blue Shield***, 54 F.Supp.2d 410, 413 (E.D.Pa.1999)].

of Rule 1.8. No authority for this provision is offered, and none has yet been found.

The Rule prohibits a lawyer from acquiring a "proprietary interest in the cause of action or subject matter of litigation" the lawyer is conducting for a client, except in the cases of a contingent fee arrangement. The contingency fee was the predicate for the agreement between the parties prior to the contract termination. As the claimants are no longer conducting litigation on behalf of the respondent, the prohibition is nullified.

Respondent further characterizes ¶8 and ¶10 as impediments to discharging counsel. Respondent contend that the provision would make it impossible for Mr. Elder to hire new counsel, as recovery under the suit would be diminished by the first attorney's claim. This is the static situation faced by all successor counsel, when a prior attorney has been discharged. There has been no authority proffered for the position that these provision render the Engagement and Fee Agreement unenforceable. Further, as indicated above, neither ¶8 nor ¶10 were subject to scrutiny, as the respondents resignation from the Engagement and Fee Agreement was pursuant to ¶9 of the agreement.[See: August 13, 2014 e-mail from Ken Elder to Steven Cohen; Arbitration Exhibit L]

Based on the testimony of the parties, and a study of the documents and case law, it is determined that the contract executed between the claimants and the respondents in March 2014 is not violative of public policy, and is enforceable. The substantive matter for arbitration, presented by the claimants, is whether, by withdrawing from the agreement, the respondents remain responsible for the fees incurred by the claimant, during the investigatory and pre-filing stage of the attorney-client relationship. The facts presented at arbitration, in both testimony and documents, support the claimant's position on this issue.

### IV. APPLICABILITY OF THE ENGAGEMENT AND FEE AGREEMENT

On August 13, 2014 Mr. Elder sent an e-mail to Mr. Cohen stating that G3 was "exercising its option to withdraw (item #9)" from the Engagement and Fee Agreement [Arbitration Exhibit L]. Respondents contend that they terminated the relationship, as characterized by Mr. Piers in his September 25, 2016 e-mail [Arbitration Exhibit P]. The distinction is the basis for Respondent's claim that nothing is owed to the attorneys for their work:

> "Paragraph 8 provides that the client owes the Law Firms a fee if the client terminates the Law Firms *after* they have filed a case on his behalf. The clear implication of this provision is that if Respondents terminate the Law Firms *before* they have filed a complaint, then he owes them nothing. Respondents terminated the Law Firms before they filed any case on his behalf. As a result, and pursuant to paragraphs 4 and 8, Elder owes the Law Firms nothing."

See G3's Closing Argument, November 28, 2017, pg.7.

This argument is not supported by the record. The evidence and testimony establish that Mr. Elder chose to exercise his rights under ¶9 of the agreement, not ¶8, as respondents contend. ¶9 of the agreement states as follows:

9. **Client Withdrawal**: In the event our Law Firms are willing to proceed with the Unclaimed Property Litigation and you determine to withdraw, you agree to pay our Law Firms for all costs and expenses we have incurred, plus fees incurred to the date of your withdrawal at our hourly rates for complex litigation, as in effect at the time of payment."

Mr. Cohen testified once the research established the viability of the cases, a mutual decision was reached to file. At this point, with the potential for litigation realized, he requested that Mr. Elder advise TARS of the Unclaimed Property Litigation, and insure that there would be no attempt by TARS to interfere. Mr. Elder was aware that the claimants had specifically "carved out" the TARS litigation from the Engagement and Fee Agreement, so there would be no overlap.

According to Mr. Elder's testimony, once informed, Gregory Lyman, TARS principal, would not allow Mr. Elder to solely prosecute the Unclaimed Property Litigation with the claimants. Mr. Elder had been concerned that prosecution of the Unclaimed Property Litigation would jeopardize his relationship (and his financial interest in pending *qui tam* litigations) with TARS. Now, once TARS was aware of the new litigation, they asserted a propriety interest over the Interest Assessment Program utilized by Mr. Elder and refused to allow Mr. Elder to continue without their involvement.

According to Mr. Elder, Mr. Cohen "refused to proceed without a written release" from TARS. Mr. Karsh and Mr. Piers contradict this assessment, testifying that they sought a meeting with TARS to try to establish a way to advance with the Unclaimed Property Litigation. Mr. Piers indicated they were willing to proceed with the lawsuit once they could meet with TARS.

The request for a meeting with TARS was never acted upon by Mr. Elder. Mr. Elder testified that he sought the advice of another attorney, and acting on that advice, withdrew from the Engagement and Fee Agreement, specifically invoking the terms of ¶9.

The facts establish that the claimants remained willing to proceed with the litigation and were ready to explore a compromise to allow the Unclaimed Property Litigation to advance. The testimony and documents establish that Mr. Elder, acting on behalf of the respondents withdrew from the Engagement and Fee Agreement. The respondents are responsible for the fees and costs incurred by the claimants, through the investigatory phase of the litigation and up to the date of withdrawal.

## V. DAMAGES

On September 4, 2014, the claimants presented Mr. Elder with a bill for legal services totaling $233,597.26. Of the sum, $232,667.50 represented legal fees, with $929.76 incurred in costs. The legal fees span from January 2014 through July 2014. There are no fees charged after July 29, 2014.

The claimant's right to damages are dictated by ¶9 of the agreement: all costs and expenses incurred, plus fees incurred to the date of withdrawal, at the hourly rates for complex litigation in effect at the time of payment. The e-mail generated by Mr. Elder on January 11, 2014 establishes the date Mr. Cohen was retained [January 2, 2014] and evidences that Mr. Elder had expected legal work to be undertaken on his behalf at that time. [See January 11, 2014 e-mail from K. Elder, Arbitration Exhibit C]. Although the contract was not executed until March 2014, there is no dispute that Mr. Cohen, and Hughes Socol were retained to begin to work on Mr. Elder's case. The rates charged reflect the rates disclosed in the

Engagement and Fee Agreement, and the work contained in the invoice reflective of the *qui tam* issues presented.

Ms. Berger-White, Mr. Piers, Mr. Karsh and Mr. Cohen all testified to the accuracy of the billing, and the use of contemporaneous time sheets. The document is detailed and provides an itemized history of the development of the potential litigation. Claimants had previously asserted an attorney's lien over the file, pending the payment of outstanding bills. That lien remains in effect. Respondents do not challenge the development of the work, but indicates that they received no benefit from the undertaking, and no proof that the work was accomplished as described. The documents and testimony belie this argument.

Mr. Elder and G3 are professionals in *qui tam* litigation; they were aware of the legal work that was generated by this potential claim, as they were intimately involved in the development of the legal theories to be prosecuted. Mr. Elder remains a consulter/relator in 11 *qui tam* cases. Of these, two involve unclaimed property litigation. As they were filed under seal, he testified had no information as to the specific issues of the cases, so he could not clarify whether (or dispute that) any of the pending unclaimed property *qui tam* cases that name him as the relator involve the same legal theories as were developed with the claimants.

The billing sheets establish that between January 2, 2014 and January 29, 2014, Mr. Cohen, Mr. Karsh and Ms. Berger-White spoke with, or e-mailed Mr. Elder daily. In February 2014, there were weekly meetings between Mr. Elder and Mr. Cohen, and telephone conferences and e-mails from Ms. Berger-White and Mr. Karsh. March and April reflect investigation and research, with Mr. Elder being contacted by the attorneys, by telephone, e-mail or conference every two weeks. By May, and through June, the e-mails and conferences resumed weekly as a Disclosure Statement was drafted for several targeted states. In July the conferences continued, but the focus had shifted to TARS. The record is silent as to any facts that may contradict the necessity and completeness of the work undertaken on the respondent's behalf.

## VI. CONCLUSION

Based upon the record presented, it is determined that the Claimants, Cohen Law Group and Hughes Socol Piers Resnick & Dym, Ltd. are entitled to recover attorneys fees in the amount of **$233,597.26** from Kenneth Elder and G3 Analytics.

The third respondent, Elizabeth Elder, has been represented by counsel in this action. There is no evidence as to her role, either in the development and prosecution of the Unclaimed Property Litigation, or in her involvement in G3 Analytics. Further, when Mr. Elder withdrew from the Engagement and Fee Agreement executed between the respondents and claimants, he signed as "Ken Elder, G3 Analytics." Nowhere on the record is there any indication that Elizabeth Elder, or the claimants, have ended her involvement in this contract. Absent any facts upon which to make a determination, Elizabeth Elder's liability in this matter is unproven and unstated.

In accord with ¶22, **Alternative Dispute Resolution** of the Agreement, both parties shall bear 50% of the cost of arbitration. There are no provisions either contractual or independent for the consideration of recovery of fees for pursuing this action.

This award resolves all issues submitted for determination in this proceeding.

Dated: December 21, 2017

Hon. Susan Zwick [Ret.]
Arbitrator

# SERVICE LIST

| | |
|---|---|
| **Case Name:** | Hughes Socol Piers Resnick & Dym, Ltd., et al vs. Elder, Kenneth, et |
| **Reference #:** | 1340013857 |
| **Panelist:** | Zwick, Susan , |
| **Hear Type:** | Arbitration |
| **Case Type:** | Business/Commercial |

---

### Juliet Berger-White
Hughes Socol Piers Resnick & Dym Ltd.
Juliet Berger-White — Claimant
70 W. Madison St.
Suite 4000
Chicago, IL 60602
jberger-white@hsplegal.com
Phone: 312-580-0100
Fax: 312-580-1994

**Party Represented:**
Cohen Law Group
Hughes Socol Piers Resnick & Dym Ltd.

### Steven H. Cohen
Cohen Law Group
Steven H. Cohen — Claimant
70 W. Madison St.
Suite 4000
Chicago, IL 60602
scohen@cohenlawgroup.com
Phone: 312-327-8800
Fax: 312-327-0266

**Party Represented:**
Cohen Law Group
Hughes Socol Piers Resnick & Dym Ltd.

### Joshua Karsh
Hughes Socol Piers Resnick & Dym Ltd.
Joshua Karsh — Claimant
70 W. Madison St.
Suite 4000
Chicago, IL 60602
JKarsh@hsplegal.com
Phone: 312-580-0100
Fax: 312-580-1994

**Party Represented:**
Cohen Law Group
Hughes Socol Piers Resnick & Dym Ltd.

### Matthew J. Piers
Hughes Socol Piers Resnick & Dym Ltd.
Matthew J. Piers — Claimant
70 W. Madison St.
Suite 4000
Chicago, IL 60602
mpiers@hsplegal.com
Assistant's Email: gsantos@hsplegal.com
Phone: 312-580-0100
Fax: 312-580-1994

**Party Represented:**
Cohen Law Group
Hughes Socol Piers Resnick & Dym Ltd.

### Amir R. Tahmassebi
Konicek & Dillon PC
Amir R. Tahmassebi — Respondent
21 W. State St.
Geneva, IL 60134
amir@konicekdillonlaw.com
Phone: 630-313-2071
Fax: 630-262-9659

**Party Represented:**
Elizabeth Elder
G3 Analytics, LLC
Kenneth Elder

---

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Hughes Socol Piers Resnick & Dym, Ltd., et al vs. Elder, Kenneth, et al.
Reference No. 1340013857

I, Michael McCants, not a party to the within action, hereby declare that on December 21, 2017, I served the attached Arbitration Decision and Final Award on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Chicago, ILLINOIS, addressed as follows:

Matthew J. Piers Esq.
Joshua Karsh Esq.
Juliet Berger-White Esq.
Hughes Socol Piers Resnick & Dym Ltd.
70 W. Madison St.
Suite 4000
Chicago, IL 60602
Phone: 312-580-0100
mpiers@hsplegal.com
JKarsh@hsplegal.com
jberger-white@hsplegal.com
    Parties Represented:
    Cohen Law Group
    Hughes Socol Piers Resnick & Dym Ltd.

Amir R. Tahmassebi Esq.
Konicek & Dillon PC
21 W. State St.
Geneva, IL 60134
Phone: 630-313-2071
amir@konicekdillonlaw.com
    Parties Represented:
    Elizabeth Elder
    G3 Analytics, LLC
    Kenneth Elder

Steven H. Cohen Esq.
Cohen Law Group
70 W. Madison St.
Suite 4000
Chicago, IL 60602
Phone: 312-327-8800
scohen@cohenlawgroup.com
    Parties Represented:
    Cohen Law Group
    Hughes Socol Piers Resnick & Dym Ltd.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Chicago, ILLINOIS on December 21, 2017.

_____
Michael McCants
mmccants@jamsadr.com